Good morning, Your Honors, and may it please the Court, my name is Brian Nadler from Fenimore here in Seattle, appointed pro bono counsel on behalf of Appellants David and Ganna Dearinger, and I'd like to reserve three minutes for rebuttal. This appeal, so I want to make three points here. First, the denial of counsel of making the request for counsel under Section 1915E1 was an abuse of discretion and not harmless. Second, that summary judgment on the issue of proximate cause cannot stand because it rests on a record that insufficiently answers the legal issue. And third, the district court compounded those errors by applying the sham affidavit rule to exclude important information about one of the Dearinger's prescribing physicians without making the findings the court requires. Starting with the denial of counsel, Section 1915E1 requires a case-by-case inquiry focused on whether the litigant can fairly proceed without assistance given the complexity of the case. And here the district court recognized a host of factors that collectively here point towards making the request for counsel. It acknowledged that pharmaceutical product liability cases are among the most complex cases the court sees. At the same time, it acknowledged Mr. Dearinger's legal materials, his wife's language barrier, and the pandemic error restrictions on Mr. Dearinger's public library access. And it also noted that the Dearingers had made good, you know, good faith but unsuccessful attempts to obtain counsel. And despite that, the court refused to request appointing counsel without getting into the two analytical factors, you know, which are one, evaluating the likelihood of success on the merits, and two, the ability of the Dearingers to articulate their claims considering the complexity of the legal issues. You know, first, on the likely, on the examination of the merits, you know, the district court instead seemed to deem it significant that no attorney had taken the case and doubted one would despite the availability of a contingency fee prospect. And this court has projected similar reasoning in Bradshaw that if the ability to, inability to secure counsel justified denial, Section 1915E1 would have no meaning. And second, it relied on the Dearinger's filings being clearer than other pro se parties, or as the district court mentioned, or some lawyers, you know, but writing clarity is not the ability to litigate an expert-driven, medically complex, failure-to-warn case. You know, counsel matters for many things, including theory development, party identification, expert, in this case, as the Dearingers mentioned, expert retention, and conducting discovery, not just writing. And that error wasn't harmless. You know, as, you know, once counsel was denied, If you think about harmless error, don't you necessarily have to look at what happened at summary judgment? Yes, Your Honor. And yes, and so this brings me to summary judgment, you know, and even leading into that, the Dearingers were locked out of tools necessary to litigate fairly, you know, in response to the first summary judgment motion, they noted that they had had issues retaining experts who wouldn't work with them without having counsel, you know, I understand that, you know, it was tough for them. No question about it. Well, and so summary judgment, there were issues in summary judgment that would have been avoided with the Dearingers having counsel. And you could get to that when you look at the, how the grant of summary judgment was flawed based on the issue of proximate cause. And so when you get to the issue of the summary judgment motion, Lilly had based a lot of it off of Dr. Barden's testimony on whether he would have still prescribed Cialis to Mr. Dearinger. And so the legally relevant question on proximate cause on summary judgment is, would be here, assuming that there is a causative connection between Cialis and ICH. And there's a warning to not to prescribe Cialis to someone at risk for ICH. Would Dr. Barden have changed his prescribing decision? And the context of the questioning in the transcript is important. The framing of this matters. The legally relevant hypothetical is absent. So the Dearingers had proposed a warning in discovery that they, stating that PDE5 inhibitors can cause disease blood vessels in the brain to burst and as such should not be prescribed to patients with ICH risk or family history of ICH. And that's at SCR 486. And Dr. Barden was- Yeah, I'll ask you a question. Yes. Part of the challenges for me as I was reviewing some of this is in maybe other traditional notions of harmless error, there's a proffer. And so we might know what would have happened if evidence was considered. Here we have a problem with just the ability to develop the evidence altogether. At what point is our, not imagination, this isn't the right word, but how far should we be delving into the possibility that there could have been a difference in the way that evidence would have been developed if an attorney had been appointed before it's too much of an engagement in the possibility? Yes, Your Honor. So here, I don't think you need to go that far to see where the critical difference is. So you don't need to dive that far to see where this distinction is. So here, and I think if you had to go too far to make that leap, that would be one thing. But here- But here you're saying we wouldn't have to go that far. Correct. And what are the indications of the evidence or even the partial evidence that existed here that suggests to you that had an attorney been involved, it could have very well been different, or at least it was sufficiently, the probability was sufficiently different enough that it would have been harmful? Sure. And I'm going to jump between a couple of different points in the record here. So first, when you look at the questioning to Dr. Barden, he's asked what evidence he has supporting the parts of the Dieringer's proposed warning. And then in that context, Lilly asks him, you know, given it almost in that context, it's given that warning, and what's in Lilly's existing warning, which for summary judgment purposes, we're presuming is inadequate. Would you have made a different prescribing decision? And Dr. Barden's response is, you know, he said at SCR 400 to 401, it's a very qualified response. It's, you know, typically for a diseased blood vessel, aneurysm for rupture would go along with a higher blood pressure, so no. And so A, that's very qualified. And in Dr. Horst's testimony, and he's the physician who resumed prescribing duties after Dr. Barden, there, you know, one of the questions that's posed to him is, if when faced with a warning that Cialis would cause ICH, would he have made a different prescribing decision? He says that he likely would have. And then kind of going back to, and then I think Lilly asks him another question about, you know, the warning that, the sufficiency of the warning that the Derringers provided. And he doesn't really see a remarkable difference between the warning that the Derringers provided and the warning that Lilly already provided for Cialis. So you see these issues that, you know, generated between the issue of proximate cause on an increased warning and the label that the Derringers had proposed. And I think that's significant here. And one that could have been avoided, you know, early on with counsel guiding the Derringers through this. You mean they wouldn't have asked that question? I think that an attorney who, you know, having an attorney there would have qualified that question and followed up at deposition and made that, because it's a key distinction for the Derringer asked Barton if he would have changed or was it? No, Lilly asked him that question. So what would? So the way that that question was framed to Dr. Barton was, so contextually based on what evidence he knew of that would support the Derringer's proposed warning and his answers to each of those sections. So A, you know, was he aware of evidence supporting that PDE5 inhibitors can cause disease blood vessels in the brain to burst? His answer was no. And then the follow-up question was, you know, was, does he know of evidence that, you know, that this should not be prescribed to patients at risk for ICH? And his answer was no. And then the follow-up question, the framing of that was, you know, whether he thought the framing of this was whether he thought there was some scientific incorrectness in the warning itself. And based on that, would he have changed his prescribing decision? It's different than, you know, if you, if he was given a warning that said, and assuming it's true, you know, can cause an ICH in patients at risk for it, do not prescribe it to these patients. And that answer is unaddressed. And I think an attorney, having an attorney on the other side to respond to that and make that follow-up question to Dr. Barton and see what his response would have been is critical. And so I just want to. I mean, have we followed up with Dr. Barton and find out what he would say to whatever questions you should have, you think should have been posed? I have not, Your Honor. So we're kind of left to speculate then. We are, but I mean, this all, this all goes back to, you know, we are, there is, there is a little bit of speculation there, but one that, you know, because summary judgment was, was answered on, was based on this and this key, this key question. It's not an answer that actually, you know, when you, when you look at the question and then how it is framed at summary judgment that, you know, yes, Dr. Barton would not have changed his prescribing decision. It's not an apt comparison and it's not actually the question that he addressed during his deposition. And so if it. That one question bore a lot of weight in the summary judgment.  How would you ask us to consider the, the analysis here and how it would be applied? At what point, I mean, here's the question I want to understand. At what point would the speculation or it would become speculation as opposed to inference on our part to determine that this would have been harmless error? You know, and Your Honor, I think if, I'm trying to think of a hypothetical here that would, that would answer that question. But, you know, I think if there was a, part of what I'm, I'm concerned about is, is maybe this is something you'd say that we ought to do is put ourselves in the shoes of the trial judge or the district judge and saying this is what we, what we would think would have been appropriate consideration. Therefore, it's harmful error to have not appointed counsel. Yes, Your Honor. And I think some of this goes into maybe the remedy that we would, that we think would be appropriate here. And, you know, I think if the court had made the request for, say, for example, the court had made the request for counsel and we know that the court cannot force someone to represent the Derringers, that would be one thing. But the court did not make that request at all. And so, and as we pointed out in the supplemental briefing, that there is counsel, that, you know, there is counsel that is willing to step in and represent the Derringers, you know, should the court reverse this. And I think that the reversal doesn't have to be a, you know, this starting, starting from page one of the entire case. You know, for example, the court can reverse and, and assuming that counsel appears and represents Mr. Derringer, that, that a limited discovery period be reopened so that Dr. Barton can be followed up with and summary judgment can be addressed on the proper grounds. It's something that even though there is speculation, there's an, there's some speculation, you know, it's not a far leap at all. It is the kind of the next question that would be asked, for example, on deposition. It's not a, it's not something that is a, that's very far afield here. And it's something that, in terms of narrow relief, the court can, can address here, give the Derringers the chance to have counsel represent them and resolve these issues, should it, you know, and even, even if it was, say, for example, it ended up being dispositive, the Derringers had counsel representing them to navigate this aspect of the case and the case going forward. You know, and I want to turn to one, one, one last bit here. I want to save some time for rebuttal. You're right. Yes, Your Honor. Good morning, Your Honors. May it please the court, Cole Carter for the appellate Eli Lilly. I want to start with this question, which is whether the, the question of whether the presence of counsel below might have altered the deposition testimony and whether that could have changed the result at summary judgment. So I want to address that question in two parts. First, I don't think there's any basis for the court to speculate that the presence of counsel would have altered the testimony, because I think that Dr. Barton's testimony is really quite clear. The, the supposed ambiguity that my friend is pointing to is that there's a series of questions about the evidence that Dr. Barton was aware of relating to the relationship, reports of Cialis and stroke. And then the final question is whether, if you would receive the warning that the Derringers proposed, would that have changed your prescription decision? And he says no. And then he, and before he says no, he gives an explanation. He says, typically for a diseased blood vessel or an aneurysm to rupture, it would go along with higher blood pressure. So no. And what he's saying is that because Cialis lowers blood pressure, which is undisputed, I wouldn't expect this to be a serious risk and it wouldn't have changed my prescription decision. And that interpretation, as I understand, plaintiffs agree with here, that, that he was rejecting the basic, the scientific basis for the proposed warning. And. And your point is to the issue of whether it's harmless error to. Correct. Not appointed. Right. The appointment of counsel. Yes, Your Honor. So the testimony is really completely unambiguous. And the fact, the explanation he gives really strengthens it for the defendant rather than undermining it, because it explains that he simply doesn't think that the warning is warranted and that it wouldn't have changed his prescription decision. Now, I understand my friend to be saying that that that's a legally significant or rather that that answer doesn't sort of assume what needs to be assumed for purposes under the learned intermediary doctrine. I believe I heard my friend say that the legally relevant question is whether assuming that there is a causal connection between Cialis and stroke, whether then the prescribing physician would have altered his decision. But that is not the relevant question. The only relevant question is whether if the warning plaintiffs propose had been on the label, would that have altered the prescription decision? And if a physician testifies that they simply wouldn't have read the label, that's enough under the learned, learned intermediary doctrine to break the chain of causation. The Washington Court of Appeals has held that and the Sherman versus Fizer case that we cite in our response brief. And this court under California law in the Himes case, Hines versus semantics, which we also cite, said that when a clinician disbelieved based on their experience with the product that the supposed risk wouldn't actually have manifested, that also breaks the chain of causation. So Dr. Barden, an attorney who was present in that deposition, wouldn't have been able to do anything with the fact that Dr. Barden appeared to the scientific basis for the warning. That is a legally sort of black and white reason that the chain of causation is broken. But the linchpin of all that is that everyone agrees that Cialis lowers blood pressure versus increases blood pressure. Correct. But even if Dr. Barden were wrong about that, it would still, for our purposes, the chain of causation would be broken because it's what he believed and whether the warning would have altered his. Would an attorney disabuse him of that belief? Well, I don't think that would have mattered because even if after the fact that he is disabused in a deposition, someone proves him wrong, the question is what he would have done at the time of the prescription decision. So if that was his belief then, then that would be the end of the story, I believe. I also want to address, though, the question that I believe Judge Kashubai raised about whether this is even the type of thing the court should be considering delving into the record and trying to imagine how it could have been shaped differently by the presence of an attorney. And I don't think it really is the type of thing that's relevant to the question of whether a failure to appoint counsel was harmless. And I would point the court to the court's decision in Wilborn, which both parties cite in their briefs. And there, and this was not, didn't arise in the harmless era context. It was about whether to appoint counsel in the first place. But I still think it's quite informative. The court said, if all that was required to establish successfully the complexity of the relevant issues for purposes meeting the first factor of the standard under 1915, if all that was required was a demonstration of the need for development of further facts, practically all cases would involve complex legal issues. And then the court goes on to say that a pro se litigant will seldom be in a position to investigate easily the facts necessary to support the case. So what the court is saying there, I believe, is that they recognize that a pro se litigant is almost never going to be as equipped to develop the record and develop the factual basis for their case as a counseled litigant will be. However, that's not in itself a reason to appoint counsel, because if it were, every single indigent plaintiff would receive counsel in a civil case. So if that can't- Much a receiving of it, but an effort to find counsel is- Correct. And I think that's a reason for another point that I want to hit in a second, but correct. But even then, the standard for requesting is set quite high by this court, which is exceptional circumstances. So it's always going to be the case that a- The district judge needs to consider the two prime factors that they must, you know, likelihood of success on the merits and- Correct, Your Honor. And I think that there are two things I would say about the likelihood of success evaluation by the district court. First, if the court thought that the district court decision doesn't really assess it at all, that at most would be harmless error, both for all the reasons we've been discussing, but even for a more immediate reason, which is if the court had explicitly considered that factor, he would have correctly found that there wasn't a particular likelihood of success based on what was before him at the time, much less as the actual record developed. And that's because this is a run-of-the-mill pharmaceutical product liability case. I don't take plaintiff's even argue that it's a particularly exceptional one. So if Mr. Derringer were entitled to a request for pro bono counsel, it's hard to see why any pharmaceutical product liability plaintiff wouldn't be entitled to the same thing. If you recall on the record, at what point did the Derringers seek the court's assistance in appointing pro bono counsel? Immediately after Eli Lilly moved to dismiss, Your Honor. At very early stages before discovery was even- Correct, Your Honor. So part of the challenge is we also- I mean, at that stage, it would have been difficult to determine whether something would have been harmful or- Well, that's true, Your Honor. And this court has made that point. And I believe in a footnote in Wilborn says, it's hard for us to make this determination at such an early stage of the case. However, that's how it has to be done because the requests are almost always made at the outset. You have to evaluate the complaint in the early- Would you say that the issues about the evidence around the labeling, for example, then is almost a red herring? Because at the time that the court would have considered appointing pro bono counsel, the questions around likelihood of success and the merits is a very different question prior to discovery being developed and evidence being made part of the record. Correct, Your Honor. And I think, additionally, the complexity of these types of cases that the district court recognized really never even came into play here because the record that we're looking at is very straightforward. It's just a deposition of Mr. Derringer and two of his physicians and whether the presence of a warning would have altered decision making. We haven't got into general causation, the things that make these types of cases complex. So I would agree that that's- Would the decision to deny counsel at the very beginning stages before discovery be a different consideration in terms of determining harmless error than if discovery had already been developed? For example, as a trial court judge, I see those cases coming across my plate where people have now sought pro bono counsel in the midst of discovery or even on the cusp of the filing of a summary judgment motion, a record is developed. I can see for myself in putting myself in those shoes, I'm evaluating now a record that might help me understand likelihood of success on the merits. Whereas at the very beginning stages, when I'm only considering allegations and a complaint, the failure to consider likelihood on the merits at all, which is what I think is the argument on appeal to even consider that factor. I mean, putting ourselves in those- With the consideration of no evidence being developed yet, it would appear to me that likelihood of success of the merits is almost error itself to not consider when determining whether to grant or deny pro bono counsel. Sorry, is it- You were saying it would be error in the context where a record has been developed or at the- When no record has been developed. When no record has been developed. And only considering the allegations and the complaint. So I think that, as I said, I think that at most the failure to address that factor is harmless because you do have to consider it on what is in front of you and all that was in front of the district court at the time was a complaint that alleges a injury that's common for individuals of Mr. Derringer's age and a- with respect to a drug that it's not recognized to generally cause stroke. So it's a run-of-the-mill and seemingly, you know, as these things go, relatively unlikely to succeed pharmaceutical product liability case. And that's all the district court had to go on. So if the court successfully addressed it, and if this court looks at it, looking at what was in front of the district court at the time- Let me ask you this. Have there been any other run-of-the-mill pharmaceutical cases like this where the plaintiffs have prevailed? Not with respect to Seattle. I'm not aware of, Your Honor. But I also wanted to mention the- It's really fair to say that a pharmaceutical case like this is just, you know, kind of common? Well, I'm saying as they- as pharmaceutical product liability cases go, this is a very run-of-the-mill one. And I would say they're quite common because- What makes it run-of-the-mill? That there's no particularly distinguishing features. It's just a plaintiff who suffered- You'd need an expert, wouldn't you? I don't think so because I think the things that make it run-of-the-mill are apparent from the pleading. So it's a very common injury. It's not like mesothelioma and asbestos where it's a signature harm like that. It's a very common- You'll need an expert on causation? Oh, yes. The plaintiffs, of course, would need an expert for general causation. That's what I meant. You need an expert on these kinds of cases. Right. But I think the implication of the call we were having is that a plaintiff would be entitled to a request for counsel under 1915e under- in any pharmaceutical product liability case because it's always necessary to have an expert for general causation. And so when- again, the ultimate test under 1915e is exceptional circumstances. So the district court is looking at a complaint that just alleges a common injury for people of Mr. Derringer's age, a drug that's not generally recognized by the FDA or any regulator to cause that injury. And so if the court had expressly considered likelihood of success, then I don't think there would have been any grounds to say this is the type of case that rises to exceptional circumstances, particularly given the fact, as the district court noted, that if anything, Mr. Derringer's pleadings were exceptionally competent for a pro se litigant. Is there any method for an indigent plaintiff to get funding for an expert or is that all? I'm not aware of any, Your Honor. And I think that that relates to the court's observation at Wilborn, which is that it's always going to be harder for pro se litigants to develop a factual record to support their claims, but that's not grounds for- Structural problem. Yes. But I did want to mention the district court's observation that Derringer's had its significance. And my friend points to the Bradshaw decision as an example of this court rejecting that type of reasoning. And I wanted to point out something significant about Bradshaw, which is that it does not involve 28 U.S.C. 1915E, which is the provision that is at issue here. It involves a Title VII specific provision, 42 U.S.C. 2000E-5, subsection F, which actually is much more generous to pro se litigants than 1915E. It allows for mandatory appointment of a lawyer, take a case, and it has a different standard for appointment. It is not exceptional circumstances. And diligence is one of the factors required to be shown. So it would be truly self-defeating to require a plaintiff to show diligence under this Title VII provision, but then hold it against them that they weren't able to obtain counsel. And there's another important distinction, which as the court observes in Bradshaw, which is that often in Title VII cases, the monetary rewards, even plus attorney's fees, are not going to be sufficient necessarily to motivate private counsel. And that's different in this context, where in the pharmaceutical product liability space, where contingency fee representation is the norm, where tens of thousands of plaintiffs every year obtain contingency fee representation. There's no dispute, though, under this statute, that the trial court did not consider the factor of likelihood of success in the matter. Not expressly in its order, but I do think... Not expressly, or so you think that they did? Or did they satisfy the element? I think that the consideration of the inability of the derringers to obtain counsel is a reasonable proxy for likelihood of success, because in this area, contingency fee representation is the norm. And if counsels who practice in this space don't think haven't, don't think the case is worth taking, that is actually a reasonable assessment of its likelihood of success, because it's so common. It also could be an indication of the size of an award. That's true. Well, I think... You have multiple reasons for why somebody may take the case, stepping... It could be for issues of liability, perhaps issues of client management and expectations. But if the award isn't large enough, given the amount of time, cost, and litigation, there may be several people, lawyers who just won't take the case. In theory, I agree with you, Your Honor. And I think that that's exactly the type of case for which the provision is designed. I don't think that would have been a reasonable judgment for anyone to make in this case where the plaintiff alleges left-side paralysis resulting from a stroke. Can I just turn your attention to the record for just a minute? Yes, Your Honor. For your last little bit of time, which is, as I understand it, so Barden initially prescribed, his prescription was for five milligrams. Is that correct? No. Originally, it was for 20 milligrams. I thought he gave... That they were... Samples. They were samples, but it was... So Mr. Derentra didn't pay for them, but there was a prescription that allowed him to access... For the 20, yes. And then Barden gave him a prescription for five? Correct, Your Honor. What happened to the prescription for 20? So the record shows that the last 20-milligram sample that Mr. Derentra obtained was in June 2008, which is 10 years before the alleged injury. I'll just... Candidly, for the court, there is a contemporaneous medical record from the day of the stroke that indicates that Mr. Derentra reported to someone at the hospital that that day he had taken two Cialis pills that he obtained from India, which would not be Willie's product. But reading the record most favorable to Mr. Derentra, what he has testified to is that he took those 20-milligram pills that he still had left over from 2008. And so, at summary judgment, construing the record in his favor and taking his testimony at face value, he was taking 10-year-old 20-milligram pills that he obtained from Dr. Barden. And that was the one he took on the day he had the... According to his testimony, yes. Okay. I'll later try to change that. Subsequent to the adverse summary judgment ruling, yes, there was... Motion for reconsideration. Correct, Your Honor. But, of course, we think the district court was perfectly correct in concluding that that was a clear contradiction of his prior testimony and motivated by the adverse summary judgment decision. Thank you. Can I ask one last question? So, because in my mind, I thought the asking whether or not paid counsel will accept it seems an inappropriate factor. But you're suggesting that it is a proxy for merits and so that, you know, likelihood of success on the merits. So it actually is an appropriate factor to consider. I think in this context, it is. And even if the court thought it wasn't a good proxy, I think, again, it's at most harmless error because if you look at what was in front... Explain why you think it is a good factor to consider. Because in this context, unlike in this case, unlike the sort of standard Title VII case where it's not an appropriate consideration, this is a serious injury. And it's the norm in these cases to obtain contingency fee representation from private counsel in pharmaceutical product liability cases. And so if expert practitioners decide not to take the case, that actually is a good proxy for merit. This is an ad hoc explanation, though. This is not what the district court said. It's not. I think it... Post hoc, sorry. Yeah, it is post hoc. I think that in context, that is part of what's motivating district court's observation. But correct, it's not expressly tied to the factor. But I do think at most, even if you disagreed with that, it's harmless error for... I get the harmless error. OK. OK. Thank you. Thank you, counsel. Just a few follow-up points, Your Honors. Judge Kassebai, I wanted to address your discussion of when to start looking at the likelihood of success on the merits. And I believe it was either in Clemens or Tillet, one of the cases we cited where the court looked at likelihood of success on the merits based on the pleadings themselves early on in the case and whether the plaintiffs had stated a cognizable claim for relief. But kind of more importantly, my friend on the other side was talking about Wilborn. And in that case, it is true that the court decided that appointment of counsel, making the request for appointment of counsel wasn't necessary. But in that case, that was a much more straightforward case in the sense that it was a case regarding a Section 1983 claim regarding a plaintiff who wanted to find out who impounded his car and took his property. It wasn't a complex pharmaceutical liability case. And my friend on the other side argued that kind of denial of counsel is besides the point because the facts were supposedly fatal from the start. But I think that puts the cart before the horse here. And it relies on a record that was developed almost entirely by Lilly after the denial of counsel. And, you know, here there is, you know, the issue of proximate cause, I think, doesn't end this case. I invite the court to review the language from Dr. Barton's deposition again and the necessary proximate cause standard. You can see that his answer to Lilly's questions are very heavily qualified. And in that context that they're asked, they don't properly answer the issue of proximate cause. In the record at SCR, I think 57 and 360, you see for the purposes of summary judgment, Lilly is not going into the issue of specific causation and the mechanism of whether Cialis actually can actually cause the ICH or really disputing the articles that Mr. Derringer had relied on initially in this case. And I wanted to mention that my friend pointed to Himes v. Somatics. And I think in that case, too, I think the California Supreme Court had just had also addressed the issue of whether other additional prescribing physicians would be relevant to the issue of whether or not their decisions, their subsequent decisions would be relevant to that issue of proximate cause and whether those should be considered. So, for example, and I see that my time is up. Your Honor, I'll just stop there. You know, we asked the court to reverse and allow the counsel. I suppose you failed to make the probably the most patently obvious argument, which is your presence is proof positive that pro bono counsel can make a difference. Yes, Your Honor. Could make a difference. Yes, Your Honor. Thank you for your pro bono representation is quite able. And thank you both for your arguments. This court is adjourned for the week. All rise. Hear ye, hear ye. All persons having had business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart for this court for this session. Now stands adjourned.
judges: PAEZ, BUMATAY, Kasubhai